IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CLARENCE L. WHITE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 04-1078-CV-W-HFS |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

**I.    Procedural Background**

On July 25, 2001, plaintiff applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and on the same date, filed an application for supplemental security income benefits ("SSI") under Title XVI, 42 U.S.C. §§ 1381, et seq. (Tr. 107-09, 337-39). Plaintiff alleged a disability onset date of September 4, 1996, and alleged disability due to fibromyalgia; osteoarthritis; heel spurs and plantar fasciitis of both feet; bursitis; obesity; chronic sinusitis and tonsilitis; hypertension; and gastroesphageal reflux disease. Plaintiff's applications were initially denied, and he timely requested a hearing. A hearing was held on June 17, 2003, and by a decision dated February 10, 2004, the Administrative Law Judge ("ALJ") determined that plaintiff suffered from the impairments noted above, as well as from a very short tear of the peroneus longus tendon of the right ankle; bursitis and mild osteoarthritis of the left shoulder; status-post tonsillectomy in August of 2001; a history of kidney stones most recently resolved in 2002; and that the hypertension and GERD were well controlled by prescribed medication. (Tr. 18-32). Although

the ALJ found the impairments to be severe, he concluded that, either singly or in combination, they did not meet or equal a listing. (Tr. 32). For the reasons set forth herein, the decision of the ALJ is affirmed.

II.     **Factual Background**

The facts as set forth in the parties' respective briefs are sufficient, and will therefore be merely summarized here[1].

Plaintiff's Testimony[2]

At the time of the hearing, plaintiff rented a house, and lived with his two sons, ages 21 and 20, and with his 9 year old niece. (Tr. 41-42). He was married, but separated from his wife. (Tr. 42). Plaintiff was 49 years of age, and obtained a General Equivalency Diploma at the age of 33. (Tr. 42-43). He subsequently obtained a certificate in auto body and fender repair, and heating and cooling.

---

[1]At the outset, the ALJ noted that plaintiff previously applied for Title II and Title XVI benefits, and although the earlier of the applications was too remote in time to reopen, the recent applications filed on January 16, 1998, were denied on April 17, 1998. (Tr. 36). The ALJ concluded that since the denial of the Title XVI application occurred more than 2 years prior to the filing of the current application, it was not subject to reopening. (Id). However, since the denial of the Title II application was within 4 years of the filing of the current application, it was subject to reopening for good cause in the event plaintiff was found to be disabled on his current applications. (Tr. 36-37).

[2]Prior to the commencement of plaintiff's testimony, the ALJ advised plaintiff that in order to be successful on his application for SSI benefits he only needed to establish that he was or had been disabled, and that he became disabled any time on or after filing for those benefits. (Tr. 39). However, in order to be entitled to disability benefits, he must establish that he is disabled and that the disability began when he was insured for disability purposes under the Act. (Tr. 40). In other words, plaintiff had to show that he worked enough and paid a sufficient amount of social security tax to have enough quarters of coverage to be insured for disability. (Id).

(Id). Plaintiff was 5'8" tall and weighed 231 pounds; plaintiff stated that he gained about 40 pounds since his disability onset date of 1996. (Tr. 43-44).

In 1997, while working for Argosy Casinos, plaintiff took a medical leave of absence and received disability payments for 2 years. (Tr. 44). Prior to the leave of absence, plaintiff performed general maintenance which included carpentry, plumbing, and electrical t Argosy Casinos. (Tr. 45). The work required that he stand on his feet most of the time, and periodically he was required to lift over 50 pounds. (Id). Prior to that he worked at WMI Construction performing general labor and some jackhammering and loading. (Tr. 46). Plaintiff explained that WMI was a building contractor that replaced tanks at service stations, and concrete finishing. (Tr. 46-47). Before that, plaintiff worked for AJM Packaging Corporation removing bags from the assembly line and packing them into boxes; while working there he was also required to lift over 50 pounds at a time. (Tr. 47).

When questioned by his attorney, plaintiff testified that he had been treated by Dr. Mehta for the past 3 years. (Tr. 49). He experiences drowsiness from his medication, i.e. Mobic and Amitriptylene. (Tr. 49, 55). Plaintiff's tonsils were removed and he has had kidney stones on 2 occasions. (Tr. 50). He also has heel spurs and pain in his ankles. (Tr. 50-51). He can stand about 10 minutes before needing to sit down, and he can walk about ½ a block; he also has difficulty climbing stairs. (Tr. 51).

In 1996, Dr. Cohen diagnosed plaintiff with fibromyalgia; he has pain in his hips, lower back, knees, ankles, elbows, wrists, and neck. (Tr. 52). On a scale from 1 to 10, plaintiff estimated the pain to be a 10 on some days, and then it lessens to a 5. (Tr. 53). The pain medication dulls the pain. (Id). Plaintiff estimated that he could lift about 5 pounds; he could sit for 20 minutes before needing to get up; and he needs to lie down 3 times a day for 30 minutes to 2 hours to relieve the

3

pain. (Tr. 54). Plaintiff also feels fatigue and short-winded about once a week. (Tr. 55). Plaintiff can open and close drawers but feels pain. (Tr. 55-56). He suffers from allergies on a daily basis, especially dust. (Tr. 56). Cold weather intensifies his pain. (Id).

It takes plaintiff 2 hours to fall asleep, and he is not able to sleep through the night; he sleeps about 5 hours. (Tr. 58). Sometimes he has trouble remembering what he went into a room to retrieve, concentrating, and completing tasks. (Tr. 59-60). Plaintiff's children cook and clean; plaintiff can only do housework for 5 to 10 minutes before needing to rest; he does not do yard work. (Tr. 61). Plaintiff goes to bed at 12:00 midnight, usually wakes up between 5:00 and 6:00 a.m., and gets out of bed at 8:00 a.m. (Tr. 62). He spends his day watching television; he drives, but must reduce the pain medication before doing so. (Id). Plaintiff does not participate in any sporting activities, and attends church once a month. (Tr. 63).

Vocational Expert Testimony

The vocational expert defined plaintiff's past work as a production worker and general construction laborer as heavy, unskilled, and his past work as a maintenance repairer as heavy, semi-skilled. (Tr. 65).

The ALJ asked the vocational expert to assume a hypothetical individual of plaintiff's age, educational background, and past relevant work experience, who cannot lift or carry more than 10 pounds frequently, or 20 pounds occasionally; cannot engage in prolonged walking of anything more than around a room or between rooms; must be permitted to alternate sitting and standing at 15 minute intervals; occasionally bend, stoop, squat, crouch, crawl, kneel, or climb; occasionally reach

4

overhead; and avoid more than moderate exposure to dust, fumes, odors, smoke; temperature and humidity extremes. (Tr. 66). The vocational expert testified that such an individual could not perform plaintiff's past relevant work; but could perform sedentary, unskilled work as a small parts assembler, a hand packager, and a surveillance system monitor. (Tr. 67). According to the vocational expert, there were approximately 4,000 small parts assembler jobs in Missouri, and 143,000 nationally; 1,100 hand packager jobs in Missouri, and 37,600 nationally; and 3,000 surveillance system monitor jobs in Missouri, and 290,000 nationally. (Tr. 67-68). The vocational expert explained that these occupations allowed for the sit/stand option. (Tr. 68).

When examined by counsel, the vocational expert testified that if plaintiff needed to lie down 2 to 3 times a day, his past work, and other work would be precluded. (Id). If plaintiff was limited to lifting 5 pounds, the range of sedentary employment would be restricted. (Id). If plaintiff's pain ranged from 5 to 10 on a scale of 1 to 10, he would be precluded from his past work or any other work. (Id).

**III.    Standard of Review**

Review of a final decision of the Commissioner of Social Security is limited to determining if the decision is supported by substantial evidence on the record as a whole. Sanchez-Wentz v. Barnhart, 216 F.Supp.2d 967, 971-72 (D.Neb. 2002). Substantial evidence consists of more than a mere scintilla, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Sanchez-Wentz, at 972. The decision should not be reversed merely because substantial evidence would have supported an opposite conclusion. Id. However, the court's review is not simply a rubber stamp for the Commissioner's decision and involves more than a search for

5

evidence supporting the Commissioner's findings. Id. To determine whether existing evidence is substantial, evidence that detracts from the Commissioner's decision as well as evidence that supports it must be considered. Id. Additionally, the court's review of the decision must include a determination as to whether the proper legal standards were applied. Id.

**IV.     Analysis**

Plaintiff contends that the ALJ did not apply the correct legal standard in assessing his RFC. Specifically, plaintiff argues that (1) the ALJ's finding regarding his condition of fibromyalgia was contradictory; (2) the ALJ improperly discounted the opinion of his treating physician; (3) the ALJ improperly discredited his subjective complaints of pain; and (4) the ALJ failed to properly evaluate his impairments in determining his RFC.

A claimant's RFC is what he or she can do despite his or her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); 20 C.F.R. § 404.1545. It is the claimant's burden, and not the Commissioner's burden, to prove the claimant's RFC. Pearsall, at 1217.

It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations. Pearsall, at 1217. However, before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility. Pearsall, at 1218. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any evidence relating to: a claimant's daily activities; the duration, frequency, and intensity of pain; the dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. Id;

6

citing, Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts. Id.

In applying the above credibility analysis, substantial evidence supports the ALJ's determination of plaintiff's RFC. As testified at the hearing, plaintiff began treatment with Dr. Donald L. Cohen in February of 1996, complaining of pain in his hips, knees, legs, heels, and pain and numbness in his hand and arm during cold weather. (Tr. 20, 221). Dr. Cohen diagnosed probable arthritis and prescribed Voltaren. (Id). On July 26, 1996, Dr. Cohen diagnosed plaintiff with probable fibromyalgia. (Tr. 20, 219). Dr. Cohen continued treating plaintiff throughout 1996, 1997, and 1998; noting plaintiff's complaints, and prescribing medication, i.e. Amitriptyline, and Elavil. (Tr. 219, 207).

During the same time frame, Dr. Cohen referred plaintiff to rheumatologist, Dr. Anne Regier. After conducting a joint examination on September 9, 1996, Dr. Regier found only 2 out of 14 trigger points present. (Tr. 21, 254). She noted that plaintiff was quite content with the efficacy of Voltaren. (Tr. 253). On December 6, 1996, Dr. Regier's impression was arthralgias, and she again noted plaintiff's continued satisfaction with Voltaren. (Tr. 21, 248). On April 4, 1997, Dr. Regier's notes indicate possible fibromyalgia, and suggested that plaintiff pursue work hardening. (Tr. 21, 247). On September 4, 1997, Dr. Regier's notes indicate plaintiff's satisfaction with DepoMedrol injections received, his statement that it eliminated his joint pain entirely, and that he needed no additional medication for the joint pain. (Tr. 21, 244). Her notes further indicate that, during this time, plaintiff injured his back while lifting a tree limb and presented to Dr. Pratt for treatment; she noted that the arthralgias was resolved, and advised him to continue the work hardening program. (Id). On January 28, 1998, plaintiff presented to Dr. Regier complaining of muscle soreness; upon

7

physical examination, Dr. Regier found no obvious synovitis affecting small joints of the hands, wrists, elbows, or shoulders. (Tr. 242).

Plaintiff's satisfaction with the injections was repeated in the notes of plaintiff's work hardening program. (Tr. 22, 190). In a Physical Therapy Progress Report dated May 8, 1997, it was noted that after 4 visits plaintiff experienced improved range of motion and flexibility, and that he was performing the exercises with less and less pain. (Tr. 190-91).

On July 30, 1997, plaintiff presented to Dr. Susan Bonar complaining of heel and ankle pain. (Tr. 22, 204). Examination revealed tenderness over his plantar fascia insertion bilaterally at the heels, and she recommended that plaintiff wear a short leg walking cast on the left for 1 month, and a night splint on the right. (Tr. 203). A follow up visit on August 27, 1997, revealed improved heel pain, and Dr. Bonar suggested that plaintiff return on an as needed basis. (Tr. 22-23, 202). As noted above, plaintiff was treated by Dr. Pratt for low back pain after injuring himself lifting a tree limb, and after examination, Dr. Pratt's impression was that plaintiff suffered from low back pain with a history of fibromyalgia and inflammatory arthritis. (Tr. 23, 200). Dr. Pratt recommended participation in a conservative physical therapy treatment program, followed by physician reassessment. (Id). After completing the program, plaintiff met with Dr. Pratt the following month, and Dr. Pratt noted that plaintiff had a good response to treatment, all goals were met, and he directed plaintiff to continue a home maintenance program; he repeated his impression of plaintiff's impairments. (Tr. 199). In a letter dated January 12, 1998, Dr. Pratt clarified that although he released plaintiff to return to work, it was due to satisfactory progress with his heel and low back pain issues. (Tr. 197). He did not intend to address plaintiff's vocational status as it pertained to his conditions of fibromyalgia or inflammatory arthritis. (Id).

8

On March 27, 1998, Dr. Allen Parmet performed a disability examination, and reviewed the medical records of Dr. Bonar, Dr. Pratt, Dr. Regier, and Dr. Cohen. (Tr. 225). After examination, Dr. Parmet diagnosed plaintiff with probable arthritis and myalgia, probably related to an autoimmune phenomenon. (Tr. 227). According to Dr. Parmet, plaintiff did not meet the diagnostic criteria for fibromyalgia because he lacked the diagnostic tender points. (Id). Dr. Parmet concluded that plaintiff could perform work-related functions such as walking, standing, sitting, lifting, carrying and handling objects, but due to fatigue and arthralgias/myalgia, he did not appear able to sustain a work effort beyond the sedentary or light level. (Id).

On November 18, 1999, plaintiff presented to Dr. Samuel Mehta complaining of muscle and joint pain. (Tr. 25, 310). A physical exam conducted on November 18, 1999, was normal, and Dr. Mehta noted that plaintiff probably had fibromyalgia with rheumatoid arthritis. (Tr. 25, 309). On December 2, 1999, Dr. Mehta noted that plaintiff was doing very well, and although Ultram did not control all of his symptoms, it helped his joint pain. (Tr. 25, 304). Dr. Mehta also noted that blood tests yielded normal results, and the arthritis panel, and rheumatoid factor were normal; Dr. Mehta suggested that plaintiff obtain the medical records of his treating physician. (Tr. 304). On June 27, 2000, Dr. Mehta noted that plaintiff's medical problems were stable; plaintiff's medication was changed from Celebrex to Amitriptyline, and he was given a sample of Mobic. (Tr. 302). On April 26, 2001, Dr. Mehta treated plaintiff for laryngitis, and noted that the new medications stabilized the fibromyalgia. (Tr. 300). On June 4, 2001, plaintiff was treated for tonsilitis, and Dr. Mehta advised him to continue the pain regimen for the fibromyalgia. (Tr. 299). After examining plaintiff on June 25, 2001, Dr. Mehta noted that plaintiff's musculoskeletal pain was better, as well as tingling and numbness in the lower and upper extremities; Mobic appeared to be the stabilizing

9

factor. (Tr. 294). In November of 2002, plaintiff presented complaining of chest pain which Dr. Mehta found to be part of the fibromyalgia; Dr, Mehta added Skelaxin to his regime, and continued use of Amitriptyline and Mobic. (Tr. 317). During a visit on November 25, 2002, plaintiff reported feeling much better, and that the pain was improved by 60 to 70%; however, he still experienced pain in his chest. (Tr. 313).

In continuing the Polaski analysis, the ALJ noted that plaintiff had a sporadic work history and widely fluctuating earnings which indicated that plaintiff did not have a compelling financial incentive for competitive full time work. (Tr. 27). A lack of work history may indicate a lack of motivation to work rather than a lack of ability. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); see also, Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (a claimant's credibility is lessened by a poor work history).The ALJ also found inconsistencies with plaintiff's daily activities which he claimed were greatly restricted due to his impairments, yet he reported to treating physicians that he engaged in carpentry, plumbing, mowing the lawn, lifting a tree limb, and other odd jobs. (Id). The ALJ found plaintiff to be less than credible because although he claimed he could no longer perform household chores, in a questionnaire, plaintiff stated that he previously performed these activities even though he was in pain. (Tr. 27-28). Moreover, with the exception of mowing the lawn (Tr. 219), plaintiff engaged in these other activities during the time he claimed he was disabled. (Tr. 207). Even more telling is that while plaintiff claimed to be sick, impaired, and fatigued, he attempted to obtain a foster child. (Tr. 219). Plaintiff testified that his two sons, as well as an 8 year old niece resided with him, his attempt to bring in yet another child, in his alleged condition, tends to lessen his credibility regarding his limitations.

10

The ALJ noted further inconsistencies in plaintiff's repeated reports of improved condition to Dr. Regier, while denying improvement to Dr. Cohen during the same time frame. (Tr. 28). The ALJ also noted that although plaintiff claimed a need to lie down during the day, no physician recommended such a course; in fact, most advised exercise. (Id). However, the fact that no physician recommended that plaintiff lie down is not fatal to his credibility, for the need to lie down may be a symptom. It also frequently occurs during inactivity and temporary or long-term unemployment.

Plaintiff contends that the ALJ should have more fully developed the record regarding his complaint of fibromyalgia[3]. Contrary to plaintiff's contention, the record demonstrates that the ALJ quite thoroughly reviewed the record as a whole, particularly the medical record, and found that plaintiff suffered from, *inter alia*, fibromyalgia, a severe impairment. Yet, the ALJ determined that notwithstanding plaintiff's impairments, he was not as limited as alleged. In support of this determination the ALJ noted periods of time in which plaintiff did not seek medical treatment, even while receiving health insurance benefits. (Tr. 28). The ALJ also noted that plaintiff almost consistently reported improvement of pain to his treating rheumatologist, Dr. Regier, especially after receiving injections. (Tr. 28). This is not indicative of disabling pain. Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (impairments that are controllable or amenable to treatment do not support a finding of total disability); see also, Rhodes v. Apfel, 40 F.Supp.2d 1108, 1123 (E.D.Mo. 1999).

---

[3]Fibromyalgia is a chronic condition recognized by the American College of Rheumatology (ACR), and is inflammation of the fibrous and connective tissue, causing long term but variable levels of muscle and joint pain, stiffness, and fatigue. Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003). Diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests. Id. According to the ACR's 1990 standards, fibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points. Id. Treatments for fibromyalgia include cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories. Id.

Also, Dr. Mehta's reports indicated that plaintiff's fibromyalgia was stable, and plaintiff successfully completed a regimen of physical therapy (Tr. 28). Cf. Hatcher v. Barnhart, 368 F.3d 1045, 1046-47 (8th Cir. 2004) (plaintiff had an extensive medical history, documented in a two-volume administrative record, and all of the treatment notes support her complaints and claimed limitations).

Plaintiff also contends that greater weight should have been given to the opinion of his treating physician, Dr. Cohen, rather than to Dr. Parmet. Generally, the opinion of a treating physician is entitled to substantial weight; however, it is not conclusive in determining disability status and must be supported by acceptable clinical or diagnostic data. Rhodes v. Apfel, 40 F.Supp.2d at 1119. A treating physician's opinion "does not automatically control, since the record must be evaluated as a whole," and it should not be inconsistent with other substantial evidence on the record a s whole. Rhodes, at 1119; quoting, Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

First, in his letter dated March 2, 1998, Dr. Cohen stated that plaintiff was unable to work, and was disabled. (Tr. 206). A statement by a physician that a claimant is disabled does not mandate a finding that the claimant is disabled, for the issue of whether a claimant suffers from a disability, as defined by the Social Security Act, is an issue expressly reserved to the Commissioner. Rhodes, at 1121. Second, the ALJ noted internal inconsistencies in an Attending Physicians Statement completed by Dr. Cohen on December 18, 1996. (Tr. 29, 217). Initially, Dr. Cohen indicated that plaintiff was totally disabled as to his current job, and any other work. (Id). However, he then indicated that plaintiff was a suitable candidate for occupational rehabilitation, and that trial employment could possibly begin in February of 1997. (Id). Dr. Cohen's treatment notes of the same date reveal plaintiff's report of performing hammering and other odd jobs at home, even with pain; and Dr. Cohen advised plaintiff to stay off work until he could perform heavy maintenance without

12

pain. (Tr. 29, 208). Finally, the ALJ noted that Dr. Cohen's opinion that the work hardening program was unsuccessful, was inconsistent with the physical therapists who noted improvement in range of motion and strengthening, and also noted plaintiff's stated satisfaction with injections received from Dr. Regier, and reported decrease in overall pain. (Tr. 29, 190). In view of Dr. Cohen's internally inconsistent opinions, the inconsistent opinions expressed in his treatment notes, as well as the inconsistency of his opinions with those expressed by the physical therapist and Dr. Regier, the ALJ gave little weight to Dr. Cohen's opinion. This was not error, for the ALJ gave good reason to discount Dr. Cohen's opinion, and substantial evidence as a whole supports the ALJ's reasoning. Rhodes v. Apfel, 40 F.Supp.2d at 1121 (where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the court to make).

In sum, the ALJ thoroughly reviewed all of the relevant evidence, including the medical records, physicians' opinions, and plaintiff's testimony regarding his daily activities, and overall condition. Darland v. Barnhart, 233 F.Supp.2d 1199, 1215 (D.S.D. 2002). The ALJ then properly performed the Polaski analysis in evaluating plaintiff's subjective complaints and the extent to which his symptoms affected his ability to work. Id. In so doing, the ALJ determined, *inter alia*, that plaintiff could not engage in prolonged walking, must be permitted to alternate between sitting and standing at 15 minute intervals, and could not perform work activities involving more than moderate exposure to dust, fumes, and chemical pollutants. The resulting hypothetical posed to the vocational expert captured the concrete consequences of plaintiff's deficiencies and set forth the impairments the ALJ accepted as true in light of the medical evidence and the record as a whole. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (a hypothetical question need only include impairments that are supported by the record and which the ALJ accepts as valid). It therefore follows that the

13

vocational expert's testimony that plaintiff was capable of performing a significant range of light work, with non-exertional limitations was based on substantial evidence on the record as a whole. Id.

Accordingly, it is hereby

ORDERED that plaintiff's request for judgment is DENIED, and the decision of the Commissioner of Social Security is AFFIRMED. The clerk of the court is directed to enter judgment in favor of defendant.


/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

March 28, 2006

Kansas City, Missouri